UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 22-CR-89(1) (WMW/TNL) |
| Plaintiff, | |
| v. | **DEFENDANT'S POSITION WITH RESPECT TO SENTENCING** |
| LEON KISMIT BELL, | |
| Defendant. | |

# INTRODUCTION

Leon Bell comes before this Court for sentencing as a 48-year-old man who has survived intense, lifelong trauma and addiction. He has attained sobriety and productivity intermittently in his life but struggled to maintain it. He knows that, at his age, he needs to change his pattern of relapse and reoffense. Mr. Bell is committed to participating in programming and training while in prison. And he hopes to benefit from intensive reentry-support programming upon supervised release. He urges this Court to impose a sentence of 86 months, which will be sufficient but not greater than necessary to accomplish both the retributive and rehabilitative goals of sentencing under 18 U.S.C. § 3553(a).

# FACTUAL AND PROCEDURAL BACKGROUND

## I. Leon Bell's childhood: *I wasn't set up for success, I was set up for survival.*

As Leon Bell bluntly puts it, he was "born and raised in a drug family." Exh. A at 2. He was born prematurely to a mother who, at age 14, was only a child herself. She used heroin during her pregnancy, and Mr. Bell was born addicted to the drug. He spent a significant period in an incubator in the hospital. When he finally came home, he was raised

1

primarily by his maternal grandparents. Both of his parents were addicted to drugs and cycled in and out of jail. While his grandparents, too, were severe addicts, they managed to stay out of custody enough to look after Mr. Bell and his two younger siblings. *Id*; *see also* PSR at ¶¶ 80–82.

Mr. Bell's grandparents gave him "a lot of love," but they failed to provide him with adequate food or safe and stable housing. Exh. A at 2. As a child, Mr. Bell never knew when he would eat next or whether there would be running water or electricity at home. The family moved every few months, sometimes splitting up to stay with whichever friend or relative could shelter them. *Id.*; *see also* PSR at ¶ 84. As a result, Mr. Bell frequently changed schools and had difficulty attaching to his school environment. He recalls feeling embarrassed about his clothing and obvious impoverishment. Exh. A at 2–3; *see also* PSR at ¶¶ 84, 102. Mr. Bell eventually dropped out in middle school, buying into his family's belief that the most important thing was street smarts. Exh. A at 3; PSR at ¶ 102. As he reflects on it now, his grandparents "weren't setting me up for success. They were setting me up for survival." Exh. A at 2.

A life of street crime was entirely normalized for Mr. Bell from a young age. His grandmother picked pockets for money, and she taught Mr. Bell to facilitate her efforts by "blocking" for her. Exh. A at 2. When she took Mr. Bell to visit his mother in state prison, his grandmother hid drugs on him, saying that his mother "needed her medicine." *Id.* Looking back on this now, Mr. Bell recognizes that his mother and grandmother "used [him] like a mule." *Id.*

The essential life lesson in Mr. Bell's household growing up was that you had to hustle, and that in hustling you had three options: be killed, go to jail, or get away. His family groomed him to try to get away. Exh. A at 2; PSR at ¶ 80. But that often didn't work out. Between the ages of 11 and 17, Mr. Bell spent significant time in juvenile detention centers. Exh. A at 5; PSR at ¶¶ 34–41. That set him up for a lifetime in and out of custody.

II.     **Leon Bell's adulthood:** *Everything was about the hustle.*

Mr. Bell's first stint in adult prison was at age 17. Exh. A at 5; PSR at ¶ 45. When he returned to the family home upon release three years later, he found it had become a crack house. Exh. A at 5. He quickly fell in line, developing both a severe addiction to crack cocaine and the stealing necessary to support it. Indeed, true to his upbringing, Mr. Bell thought of crime as a means to an end—and the end was to get enough money to support his drug habit. He reports that he "never did any crime that didn't have to do with drugs." Exh. A at 4. "Everything," he said, "was about the hustle." *Id.*

Mr. Bell's stealing would land him back in prison repeatedly in adulthood. In prison, Mr. Bell got the structure and sobriety that he never had on the streets. Exh. A at 5–6. While in custody in the early 1990s, he earned his GED. *Id.* at 3; PSR at ¶ 103. He later completed an Associate's Degree in microcomputer technology as well as three trimesters toward a culinary management degree. Exh. A at 3; PSR at ¶ 103. When released to the community, he worked in restaurants as a cook and a host, and he spent four years as a seasonal food worker at Target Field. Exh. A at 3; PSR at ¶¶ 106–113. He held down jobs while he stayed clean, and he lost them when he eventually relapsed. Exh. A at 3. Then,

3

once again, he would resort to stealing to get money for drugs and basic survival. "If I didn't steal, I didn't have it [crack]; if I didn't steal, I didn't eat." *Id.* at 4.

The cycle continued of relapse and prison, sobriety and release, and relapse once again. Mr. Bell had two brief periods of drug treatment, but never lived in sober housing and never was able to stay clean on the streets for long. Exh. A at 4; PSR at ¶¶ 97–98. When he succumbed to addiction, Mr. Bell typically became homeless. Exh. A at 4; PSR at F.3 & ¶ 89. He lived in tents, where he had to worry about propane tanks exploding and burning him. He was frequently assaulted, once being hit in the head with a hammer, another time shot at. He also witnessed others getting beaten, burned, bashed, and stabbed on the streets. Exh. A at 3, 12. He had nightmares about these incidents. He was constantly on the defensive and lived in "combat mode" to protect himself. *Id.* at 12. He learned to live alone and not develop close relationships to anyone outside his family, so as not to get hurt or see loved ones get hurt. *Id.* at 3.

### III. The net effect of a lifetime of trauma: *Severe psychiatric distress and impairment.*

Unsurprisingly, Mr. Bell's lifetime of trauma has had a deep psychological impact. Expert testing shows that he has "severe psychiatric distress and impairment." Exh. A at 7. This has resulted in self-destructive behavior and substance abuse as well as intense anxiety. *Id.* at 7, 8, 10. Mr. Bell's anxiety causes physiological symptoms and hypervigilance. *Id.* at 7, 12, 13. He begins to focus exclusively on the question, "What do I need to do to survive?" *Id.* at 14. With the drive to survive, panic sets in, so that he often exists in a fight-flight-or-freeze mode. *Id.* at 12. Living in this state, it's fair to say that trauma has become normalized for Mr. Bell over the course of his 48 years. *Id.* at 13.

4

IV. **Post-offense rehabilitation:** *I've been doing the same cycle for 49 years.  There is more to life than this.*

As in the past, Mr. Bell has benefitted from his time in custody since he was arrested in this case.  He has plunged into programming opportunities, completing 63 lessons and 24 courses through the Sherburne County Jail's educational offerings

Unlike in the past, he has immersed himself in new programming opportunities to address *both* his mental health and substance abuse.  He has taken courses in anger management, life skills, and dialectic behavioral therapy.  He has participated in a group trauma rehabilitation program called Trauma Informed.  He also has been individual therapy for the first time in his life and has begun keeping a daily diary card about his emotions and behaviors.  Program records show that Mr. Bell has been an active participant and has diligently and consistently completed assignments.  Exh. A at 3; *see also id.* at 5–6.

Mr. Bell's intensive rehabilitation efforts have already begun to work a change on him.  He is learning the therapeutic difference between "responding" and "reacting" to challenges.  Exh. A at 5.  He feels a sense of increased accountability.  And that has led to more prosocial activities and behavior.

Mr. Bell acknowledges that the structured environment of prison removes some of his primary trauma-response triggers—where he'll eat, where he'll sleep, how he'll survive—triggers that he developed in boyhood.  He recognizes that "[he] need[s] structure."  Exh. A at 5–6.  As he approaches 50, Mr. Bell feels desperate to change his life course.  *Id.* at 14.  He acknowledges that "I've been doing this cycle for 49 years" and that "there is more to life this."  *Id.* at 5.  He plans to take every available opportunity in federal prison to continue benefit from the structure and programs available.

5

V.  **Looking forward:** *Rehabilitation and support efforts will help Mr. Bell live a productive life outside of incarceration.*

Research shows that there is "a strong relationship between trauma and substance use disorders." Exh. A at 14. Consequently, addressing trauma in an effective way is necessary for healthy functioning and for managing substance abuse disorder. *Id.*

Given Mr. Bell's history of trauma and substance abuse, the expert psychologist who recently evaluated him has recommended (1) a long-term residential treatment program that addresses both his mental health and substance use in an integrated setting; (2) participation in structured reentry services; and (3) education and vocational training. Exh. A at 15.

Importantly, the expert noted that Mr. Bell has shown a pattern of sobriety, stability, and "doing well" in the structured environment of prison but has struggled to generalize his behavior to the less structured and more unpredictable outside community. Exh. A at 16. The expert observes that Mr. Bell has the insight, experience, and willingness to adapt his positive behavior from custody to the outside world. But he needs support to do so. *See id.* This Court has the power to structure a sentence for Mr. Bell that will best position him to get that support and make that transition, for the benefit of the community and him.

## ANALYSIS

In *Gall v. United States*, the Supreme Court clarified the two-step process to be followed in federal sentencing. First, the sentencing court must determine the Guidelines range applicable to the defendant. 552 U.S. 38, 49–50 (2007). The Guidelines remain "the starting point and the initial benchmark." *Id.* They "are not the only consideration, however." *Id.* In the second step, the court must consider the factors in 18 U.S.C. § 3553(a)

6

and determine whether a departure or a variance is appropriate. *Id.* at 50; *accord United States v. Pepper*, 562 U.S. 476, 490 (2011) (holding that sentencing court is required "to tailor the sentence .. . . based on appropriate consideration of all the factors listed in § 3553(a)"); *United States v. Roberson*, 517 F.3d 990, 993 (8th Cir. 2008). The court is "to make an individualized assessment based on the facts presented." *Id.* The ultimate sentence is to be based on the Sentencing Reform Act's overarching requirement that the sentencing court "impose a sentence sufficient, but not greater than necessary, to accomplish the goals of sentencing." *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007) (*quoting* 18 U.S.C. § 3553(a)) (internal quotation signals omitted).

Consistent with this two-step analysis, the discussion below first addresses the applicable Guidelines range and then turns to the applicable § 3553(a) sentencing factors to explain why the jointly recommended probationary sentence is sufficient but not greater than necessary in this case.

## I. Applicable Guidelines range (18 U.S.C. § 3553(a)(4)).

The parties and probation agree on the applicable Guidelines range. The base offense level is 20 (U.S.S.G. § 2B3.1(a)). A 5-level enhancement applies for possession of a firearm (U.S.S.G. § 2B3.1(b)(2)(C)), a 2-level enhancement applies because the offense involved carjacking (U.S.S.G. § 2B3.1(b)(5)), and a 1-level enhancement applies because the loss was greater than $20,000 but not more than $95,000 (U.S.S.G. § 2B3.1(b)(7)(A)). A 3-level reduction applies because Mr. Bell accepted responsibility for this offense (U.S.S.G. § 3E1.1(a) & (b)). This yields a total offense level of 25 (20 + 5 + 2 + 1 − 3 = 25). *See* PSR at ¶¶ 20 – 31; Plea Agreement, Dkt. No. 53, at ¶ 7. Mr. Bell is in criminal history category

VI.  *See* PSR at ¶ 72.  A total offense level of 25 and criminal history category of VI yields a Guidelines range of 110 to 137 months.  PSR at ¶ 121; *see also* Plea Agreement at ¶ 7(f).

The government has recommended a sentence at the low end of the Guidelines range based on the sentencing factors under 18 U.S.C. § 3553(a).  *See* Gov't Position Paper, Dkt. No. 78, at 1, 4–5.  As explained below, Mr. Bell submits that these same factors warrant a downward variance to a sentence of 86 months.

II.     **The applicable 18 U.S.C. § 3553(a) factors.**

Mr. Bell respectfully urges that a sentence of 86 months is consistent with the sentencing factors set forth under 18 U.S.C. § 3553(a), for the reasons set forth below.

   A.     **The nature and circumstances of the offense (18 U.S.C. § 3553(a)(1)).**

The nature and circumstances of this offense support a mitigated sentence.  The offense conduct is adequately set forth in the PSR.  *See* PSR at ¶¶ 7–11.  As the PSR notes, Mr. Bell and his accomplice stole a car from a woman in a mall parking lot after Mr. Bell brandished a gun and said he would not harm her if she gave him her keys.  He took the woman's car and purse, resulting in a total out of pocket loss to the woman of $3,941.26.  *Id.*

This offense conduct is serious, but it is also mitigated in several important ways.  First, Mr. Bell has accepted responsibility for his offense by pleading guilty before this Court and acknowledging his wrongdoing to probation.  In his statement to probation, Mr. Bell said:

> I would like to apologize for my actions at the Rosedale Mall.  I take full responsibility for my conduct that day.  I was using drugs and I was in a bad place, but that's not a justification for what I did. My grandma always taught me no matter what you do, you do not hurt anybody, under any circumstance. But I did hurt somebody when I did this.  I caused harm to this woman, her family, and to the community, and I deeply regret that.  I'm also sorry to say

8

> that I did it to get money for drugs. I'm not proud of that. I messed up, and I know it. I'm scared about what I've done and what lies in front of me, because I don't want this to be my legacy.
>
> One thing I am proud to say now is that I'm no longer using drugs. I've had a long bout with drug addiction, but I'm now in recovery. I've enrolled myself in behavior and treatment programs. I intend to use my time in prison to keep getting help with my addiction and getting help with behavioral change. And when I'm released, I intend to become a life coach and a mentor, to use my experience and the little bit that I know about life to help others know they don't have to use drugs and they don't have to go to jail. I believe that is really the person I am inside and it's what I aspire to do.

PSR at ¶ 17. Mr. Bell understands that he did wrong and that he needs structure and support to address the addiction at the root of his actions. He has already made significant efforts at rehabilitation through his coursework at Sherburne County Jail, and he intends to take every opportunity for treatment and self-betterment while in prison. His accountability and remorse mitigate the nature and circumstances of his offense.

Second, and as alluded to in his acceptance statement, Mr. Bell committed the offense as a direct result of his severe, lifelong drug addiction. He and his partner, also an addict, sought to steal the car to get money for drugs. This addiction-based motivation for this crime is mitigating as it shows that the root problem for Mr. Bell is not violence, greed, or gang involvement. Indeed, Mr. Bell never intended to harm the car's owner or to enrich himself or anyone else. Rather, he was driven by his deep and untreated substance abuse problem—a problem that he can and will address through treatment in prison and on supervised release.

Given these mitigating factors, a sentence of 86 months will be sufficient to address the nature and circumstances of the offense.

B.     **Mr. Bell's history and characteristics (18 U.S.C. § 3553(a)(1)).**

While this Court not infrequently sentences individuals with a history of addiction and trauma, Mr. Bell's background is uniquely mitigating. He was born premature, addicted to heroin, to a 14-year-old mother. As a boy, he was made to be a "mule" to his mother while he visited her in prison and trained to hustle. While he had his family's love growing up, he also was groomed by them for a life of addiction and crime. Driven by drugs to steal, he has cycled in and out of juvenile reformatories and adult prisons all his life. And while he benefitted from sobriety and structure behind prison walls, he would quickly relapse upon release, as a lifetime of trauma left him anxious, hypervigilant, constantly in a state of panic, and deeply dependent on substances to navigate the unpredictability of the outside world.

In Sherburne County Jail, for the first time in his life, he has participated in individual and group programming that specifically addresses his trauma and mental-health needs. It has been an awakening for him. He has shown himself to be an active and diligent participant in his coursework. And he's eager to continue to reap the benefits of structure and programming support in prison. Federal prison will provide more programming and opportunities than state prison does. And Mr. Bell's demonstrated history of doing well in custody indicates that he will reap the benefits of these opportunities.

Given that Mr. Bell's extraordinarily challenging upbringing and, simultaneously, his strong indicators for rehabilitation with proper structure and treatment, a sentence of 86 months will be more than sufficient.

**C.   Reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, protecting the public from future crimes, and affording adequate deterrence (18 U.S.C. § 3553(a)(2)(A)–(C)).**

The requested sentence adequately reflects the seriousness of this offense, promotes respect for the law, provides just punishment, protects the public from future crimes, and affords adequate deterrence. This is Mr. Bell's first federal offense. The requested sentence will keep Mr. Bell in custody far longer than the longest state sentence he has served in the past twenty years. Beyond that, Mr. Bell also will be subject to a lengthy period of supervised release and will be liable to pay restitution as part of his sentence. Given this, a downward variance to 86 months will adequately punish Mr. Bell and reflect the seriousness of his offense.

The requested sentence also will meet the sentencing goals of deterrence and promoting respect for the law. Eighty-six months is an extremely long sentence and will put Mr. Bell in his mid-50s by the time he is eligible for release to supervision. Research shows that recidivism rates drop significantly at that age: "arrest rates among older adults decline to a mere 2 percent by age 50" and drop close to zero beyond that.[1] Given these findings, imposing a prison sentence longer than 86 months will not promote any additional deterrence or respect for the law. Instead, the requested sentence is more than sufficient to keep Mr. Bell accountable, deter him from committing future offenses, and encourage him to respect and abide by the law.

---

[1] The Florence V. Burden Foundation. The High Costs of Low Risk: The Crisis of America's Aging Prison Population. (July 2014), *available at* http://www.osborneny.org/resources/resources-on-aging-in-prison/osborneaging-in-prison-white-paper/ (last visited Dec. 30, 2022).

### D.   The need to provide training, care, and correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(D)).

The psychological expert has emphasized that Mr. Bell's best chance of rehabilitation is not a lifetime behind bars, but rather some amount of time in custody *with intensive treatment* followed by a well-structured reentry program—something he has never had before:

> Results of this evaluation clearly indicated that Mr. Bell has experienced numerous traumatic events beginning as a young child and continuing throughout his adulthood. His trauma was untreated throughout these years and continued to be exacerbated by a lifetime of drug use, incarceration, and criminal behavior to support his use. During this time, he found stability in structured correctional settings and had a pattern of doing well in such settings. However, he was unable to generalize his behavior to the less structured and more unpredictable community when he was released from incarceration. ¶
>
> Mr. Bell has demonstrated some insight into and willingness to address during this incarceration the links between his past experiences and his current behavior. He also expresses motivation to change. ¶
>
> *As indicated, he will need long-term, intensive treatment of trauma and substance use together and will require intensive re-entry services.* He has some positive family support and role models. He also has some prosocial goals to use his verbal skills to speak to kids and adults about his experiences in order for them to take a different path, as well as to be a positive support to his daughter. *These goals combined with rehabilitation and support efforts, will increase the likelihood that Mr. Bell will live a productive life outside of incarceration.*

Exh. A at 15–16 (emphasis added).

Given these findings, it is clear that Mr. Bell needs custodial programming *and* a rigorous reentry program to succeed. This Court has the power to structure a sentence that will give Mr. Bell both opportunities. A sentence of 86 months, followed by supervision and a recommendation to participate in this District's Reentry Program, will best facilitate the sentencing goal of rehabilitation.

## CONCLUSION

Mr. Bell respectfully requests that this Court sentence him to 86 months in prison followed by three years of supervision, and $3,941.26 of restitution. This sentence is consistent with the Guidelines and is sufficient but not greater than necessary to serve the § 3553(a) sentencing goals in view of the unique circumstances of this case.

Dated:   January 6, 2023                              Respectfully submitted,

*s/ Sarah Weinman*
_____
Sarah Weinman
Assistant Federal Defender
Attorney ID No. 401624

*s/ Douglas Olson*
_____
Douglas Olson
Senior Litigator
Attorney ID No. 169067

Office of the Federal Defender
107 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN 55415
Counsel for Mr. Bell